UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JANE DOE JJ, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-02507-SEB-TAB |
| | ) | |
| USA GYMNASTICS, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |
| TORT CLAIMANTS COMMITTEE, | ) | |
| | ) | |
| Interested Party. | ) | |

## ORDER ON BANKRUPTCY APPEAL

This is an appeal from a final order of the United States Bankruptcy Court for the Southern District of Indiana denying Appellant Jane Doe JJ's ("Appellant") Motion to Allow Late Filed Claim to be Treated as Timely Filed. The bar date to file claims against the above-captioned debtor, USA Gymnastics, was April 29, 2019. Approximately five months after the deadline, on October 3, 2019, Appellant filed a belated claim. On August 3, 2020, ten months later, Appellant filed her motion to treat her late-filed claim as timely. On August 26, 2020, the Bankruptcy Court heard and denied Appellant's motion. Dkt. 6 at 32. For the reasons explicated below, the Bankruptcy Court's judgment is AFFIRMED.

## Factual Background

### *Background of Current Bankruptcy Proceedings*

1

USA Gymnastics ("USAG") filed a Chapter 11 Bankruptcy Petition on December 5, 2018, in the United States Bankruptcy Court for the Southern District of Indiana due to the high number of sexual abuse claims arising from USAG's employment of Dr. Larry Nassar. Dkt. 8 at 142. The nature of Dr. Larry Nassar's sexual assaults on hundreds of young gymnasts has been well-documented in the news media as well as in the bankruptcy record, the tragic details of which we do not reiterate here. An Additional Tort Claimants Committee of Sexual Abuse Survivors ("Survivors' Committee") was appointed by the United States Trustee on December 19, 2018 to represent the interests of sexual abuse survivors who asserted claims against USA Gymnastics. *Id.* On May 17, 2019, the Bankruptcy Court appointed Fred Caruso to serve as Future Claims Representative. Dkt. 8-2 at 257–60. The Bankruptcy Court set April 29, 2019 as the final day for claimants, including sexual abuse claimants, to file proofs of claim. *Id.* at 143.

Debtor provided forms of direct notice and publication notice after establishing the bar date for claims. Debtor mailed a notice of the bar date, a copy of the Bar Date Order, and a sexual abuse proof of claim form to all known survivors who had filed or threatened to file lawsuits against USAG alleging sexual abuse, who had reported abuse to USAG, who had entered into a settlement agreement with USAG stemming from allegations of abuse, or who had received payment from USAG as a result of an allegation of abuse, to the extent their mailing address was reasonably available. Although not strictly required by the Bar Date Order, Debtor served all potential sexual abuse claimants, even those "who never formally or clearly notified USAG of their claims, after a meticulous and comprehensive search of its books and records." Dkt. 12 at

2

3; Dkt. 12-1 at 88. This notice package was sent to more than 1,300 individuals. *Id.* Further, Debtor emailed notice of the bar date to more than 360,000 e-mail addresses for current and former USAG members. Dkt. 12-1 at 88.

Notice of the bar date was also placed on Debtor's website, Facebook, Twitter, and Instagram pages. Published notification was provided in USA Today, Inside Gymnastics, International Gymnast, the Gymcastic podcast, and the Meetscores website. *Id.* In addition, between February 26 (one day after the Bar Date Order was entered) and April 30 (one day after the bar date), Debtor pinned notice of the bar date at the top of its Twitter feed as the "pinned" tweet. *Id.* Debtor also sent letters to each of its member gyms asking those facilities to post the notice package and the sexual abuse proof of claim form for their members to see. *Id.* In addition to this formal notice, Debtor's Chapter 11 case and the deadline for filing claims received extensive media attention in national publications, local papers, and television and radio broadcasts. *Id.* Ultimately, more than five hundred individuals filed abuse claims based on allegations of sexual abuse against them by Dr. Nassar, including seventy-five previously unknown to Debtor. Dkt. 12 at 4.

### *Background of Appellant's Claim*

Appellant was a member of USAG from 2004 to 2014, until she turned seventeen years old. Dkt. 8 at 143. During this time, she was repeatedly sexually abused by Dr. Larry Nassar while he served as USAG's staff physician. Dkt. 9 at 9. She reached "Level 10," the highest level in the USAG Junior Olympics Program. As a "Level 10" gymnast, she participated in major competitions, including two national and three regional

competitions between 2012-2014. *Id.* at 8. USAG sent Larry Nassar to these high-level competitions. *Id.* at 8–9. Appellant first disclosed her experiences of sexual abuse to her mother in August of 2019. Dkt. 8 at 143. Her disclosure was delayed until five years after leaving USAG because she recounts that she struggled to come to the realization that she had been sexually abused. *Id.*

      As was required of all USAG members, Appellant provided USAG with her personal data as well as that of her parents, including her full name, date of birth, and address. *Id.* Appellant lived in Michigan during her membership with USAG. *Id.* At the time the Nassar story originally broke in the news, Appellant was in college at Western Michigan University, but had moved home to live with her parents when USAG filed for bankruptcy in December 2018. Appellant's parents have never moved from their Michigan house; they have retained the same address they had on file with USAG while Appellant was a member. Appellant has never changed her name. *Id.* at 144. However, Appellant alleges that neither she nor her parents ever received any notice of the bankruptcy via mail at Appellant's permanent address on file with USAG. *See id.*

      Appellant contends that had she received actual notice of this bankruptcy, she would have filed a timely claim. Because she did not receive direct notice, she says she did not find out about the bankruptcy until her mother began looking for attorneys in September 2019. *Id.* at 143.

      The issue before us in this appeal is whether the Bankruptcy Court erred in denying Appellant's motion to have her late filed claim treated as timely. Appellant first argues that her due process rights were violated when she was not sent notice of the

bankruptcy proceedings directly and that her claim should be treated as timely because of this violation. However, notwithstanding her due process claim, Appellant alternatively maintains that she exhibited excusable neglect in filing a late proof of claim.

## Legal Analysis

### I.      Standard of Review

The District Court reviews a final judgment of the United States Bankruptcy Court for the Southern District of Indiana based on Title 28 U.S.C. § 158(a)(1). Our review of the legal conclusions reached by the Bankruptcy Court is *de novo*. *Ojeda v. Goldberg*, 599 F.3d 712, 716 (7th Cir. 2010). The Bankruptcy Court's findings of fact are reviewed for clear error. *Id.* "If the trial court's account of the evidence is plausible in light of the record viewed in its entirety, a reviewing court may not reverse even if convinced that it would have weighed the evidence differently as trier of fact." *Matter of Love*, 957 F.2d 1350, 1354 (7th Cir.1992) (citing *EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 309 (7th Cir.1988)).

A "bankruptcy court's determination of excusable neglect is given more deference—it is reviewed for abuse of discretion." *Langel v. Kmart Corp.*, No. 03 C 7091, 2004 WL 756607, at *1 (N.D. Ill. Feb. 27, 2004) (citing *Matter of Singson*, 41 F.3d 316, 320 (7th Cir. 1994)). In general, "a court abuses its discretion when its decision is premised on an incorrect legal principle or a clearly erroneous factual finding, or when the record contains no evidence on which the court rationally could have relied." *In re Kmart Corp.*, 381 F.3d 709, 713 (7th Cir. 2004) (citing *Corporate Assets, Inc. v. Paloian*, 368 F.3d 761, 767 (7th Cir. 2004)).

5

## II.     Discussion

Appellant first contends that her constitutional due process rights were violated because she was a known creditor who was entitled to actual notice of the bankruptcy and the bar date and did not receive such notice. Because of this alleged violation, she argues that her claim should not be time-barred. Alternatively, she asserts that she established a sufficient showing of excusable neglect based on the compelling reason for her delay in filing so to require reversal of the Bankruptcy Court's order. We address these arguments in turn below.

### A. Due Process

Federal Rule 2002 of Bankruptcy Procedure does not define the term "notice," but bankruptcy courts can "sensibly assume that the general norms of fair notice as set forth in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950); *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 489–91 (1988); *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 797–800 (1983), and such other cases, apply to bankruptcy as to other settings." *Fogel v. Zell*, 221 F.3d 955, 962 (7th Cir. 2000) (citations omitted). To satisfy due process requirements, notice must be "reasonably calculated to reach interested parties." *Mullane*, 339 U.S. at 318. Content and delivery are the two basic elements that constitute fair or adequate notice. *Fogel*, 221 F.3d at 962–63 (citations omitted). There are two basic means of delivery: (1) actual "transmission of the notice to the intended recipient" and (2) constructive "publication of the notice in a newspaper or magazine or other medium likely (or at least as likely as it is feasible to arrange) to come to the attention of the person entitled to notice." *Id.* at 963.

6

Traditionally, the standard in bankruptcy proceedings has been that "actual notice is necessary only as to known creditors, whereas constructive notice is sufficient for unknown creditors." *Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 974 F.2d 775, 788 (7th Cir. 1992). However, in *Fogel*, the Seventh Circuit moved away from a rigid distinction between known and unknown creditors, based on its assessment that these classes are imprecise. *Fogel*, 221 F.3d at 963. Instead, if a potential claimant's name and address are "reasonably ascertainable" to the trustee then "[s]he is entitled to have that information sent directly to [her], but, if not, then publication of the information in the newspaper or other periodical that [s]he's most likely to see is permitted." *Id.*

Following its discussion of the "reasonably ascertainable" standard, the Seventh Circuit also stated that notice by publication may be appropriate and necessary when "potential claimants are numerous, unknown, or have small claims," and these circumstances "singly or in combination may make the cost of ascertaining the claimants' names and addresses and mailing each one a notice of the bar date and processing the responses consume a disproportionate share of the assets of the debtor's estate." *Id.* Further, Federal Rule 2002(l) of Bankruptcy Procedure provides that "[t]he court may order notice by publication if it finds that notice by mail is impracticable or that it is desirable to supplement the notice."

Here, the Bankruptcy Court ruled that constructive notice by publication did not violate Appellant's due process rights because the notice provided by Debtor was extraordinary under the circumstances and Appellant was not a known claimant. Dkt. 6 at 31–32. This determination is a legal conclusion that we review *de novo*. *Ojeda*, 599 F.3d

at 716. Based on our review, we hold as well that publication notice was appropriate based on the facts presented in the record.

Appellant argues that the Bankruptcy Court reached an incorrect conclusion of law under the *Fogel* standard in holding that she was only entitled to constructive notice because, she contends, her name and address were "reasonably ascertainable to the debtor." Dkt. 9 at 15. Appellant bases her claim that her information was "reasonably ascertainable" on the fact that she was a "known and registered Level 10 gymnast" and was therefore in a tiny pool of competitors who attended numerous competitions where Nassar acted as the USAG physician. *Id.* Appellant further contends that a claim can be barred for untimeliness only upon a showing that the creditor received reasonable notice. *Id.* at 14. Therefore, because Debtor failed to provide her with direct notice, the time for filing a proof of claim did not run against her. *Id.* at 13.

Appellant also maintains that there is no basis in law for the Bankruptcy Court's category of "known claimant" as a person entitled to direct notice as a gymnast that Debtor knew was abused by Dr. Nassar. At the bankruptcy hearing, counsel for Appellant argued that Debtor should have served "all of its gymnasts who lived in Michigan who probably had proximity to Larry Nassar." Dkt. 6 at 27. Appellant contends that the Committee failed to address how—despite its allegedly "meticulous and comprehensive search of its books and records"—a Level 10 USAG gymnast who received "treatments" from the sexual predator doctor, and for whom medical records must have been created, was "unknown." Appellant also notes that Debtor was obligated under Michigan law to

keep and maintain her medical records and therefore "should have had specific knowledge that she was a potential and likely victim." Dkt. 9 at 16.

In response, Appellee argues that Appellant's motion raises a collateral attack on the Bankruptcy Court's Bar Date Order by insinuating that anyone, regardless of whether they were specifically known to have been in contact with Dr. Nassar, should have received direct notice. Dkt. 26 at 29. Appellee believes constructive notice was appropriate because Appellant never informed Debtor of her abuse and therefore was not "known" to Debtor. Appellee maintains that Debtor conducted a meticulous search of its books and records when the notice provisions for the Bar Date Order were being crafted, relying on the language in *Fogel* discussing the appropriateness of notice by publication when potential claimants are numerous or unknown. Appellee argues that actual notice is not necessary if the burden of conducting such an extensive noticing process is disproportionate to the outcome, as would be the result in a case of this magnitude as measured by the number of potential victims, contending that the actual noticing program that Appellant suggests Debtor should have undertaken far exceeds the Seventh Circuit's standard.

We agree with Appellee's assertion that constructive notice was sufficient to satisfy due process based on the facts presented. It is unclear from the record the reason Appellant was not one of the former gymnasts who received one of the bar date email notifications sent to 360,000 current and former USAG members. Nevertheless, given that the sexual abuse by Dr. Nassar spanned many years and consisted of his preying on many young athletes in secret, constructive notice as well as direct notice was a prudent

process for the issuance of the relevant information. It deserves to be said that the nature and extent of Dr. Nassar's pattern of sexual abuse were unprecedented. In response to these horrific abuses, many gymnasts came forward to notify Debtor of their traumatic experiences. These gymnasts became known to Debtor by doing so, but the full extent of Dr. Nassar's abuses remained unascertainable as to individuals who did not come forward.

Although Debtor may have known that Appellant was a Level 10 gymnast or even may even have had her information in their files, this fact alone does not entitle Appellant to direct notice in a case of this proportion such that a failure to provide it amounts to a due process violation. As noted by Appellee, the records of the USAG Junior Olympics Program events that Appellant believes made her "known" as a likely abuse victim indicated that 450-650 individuals participated at each event. Multiple tournaments were held each year, meaning that thousands of gymnasts participated in these events over the many years that Dr. Nassar was employed by Debtor. Without more, this involvement would not make it obvious to Debtor that, because Appellant was at these events, she was also victimized by Dr. Nassar's sexual abuse of her. The Bankruptcy Court was charged with weighing the reasonableness of various notice options in light of all the circumstances presented.

In *Fogel*, the Seventh Circuit held that a large purchaser of faulty pipeline was entitled to direct notice because its information was "readily ascertainable." That case however, was marked by multiple distinguishing factors, most notably that the company had business records detailing a finite number of purchasers of a specific type of pipe.

Those records made clear that a multi-million dollar purchaser contesting the bar date would certainly have been affected by the faulty pipes purchased and therefore should have received direct notice of the bankruptcy. By contrast, the very nature of sexual abuse suggests that it is nearly impossible to determine everyone who was a victim of Dr. Nassar's horrific actions during his lengthy career with USAG. This difficulty in identifying victims prompted Debtor to encourage survivors to come forward in order to gather their information and allow them to be included in the bankruptcy proceeding. Indeed, as the Bankruptcy Court noted, the publication provided by Debtor was "extraordinary." Dkt. 6 at 31.

Based on the number of those who potentially were affected by the actions of Dr. Nassar during his time with Debtor as well as employed by Michigan State University and their potential anonymity serve to underscore the reasonableness of notice by publication. The Federal Rules of Bankruptcy Procedure allow the bankruptcy court to order notice by publication if it finds that notice by mail would be impracticable or if it is desirable to supplement the notice. Fed. R. Bankr. P. 2002(l).

Here, Debtor searched its records to directly notify individuals that fell within criteria they determined would identify likely victims, but the Bankruptcy Court reasonably determined that publication notice was also desirable to supplement the direct notice because any further steps to accomplish direct notice would have consumed a disproportionate share of the available assets of Debtor's estate for distribution to the victims. This decision by the Bankruptcy Court was sound as a matter of law and reasonable under all the circumstances. Appellant's due process rights were not violated

because the constructive notice authorized and overseen by the Court satisfied constitutional notice requirements.

### B.  The Bankruptcy Court's Denial of Excusable Neglect

Appellant's alternative theory of relief is based on her claim that the Bankruptcy Court erred in denying her motion having found an insufficient showing of excusable neglect. In determining whether a claimant has made a sufficient showing of excusable neglect, a court is directed to consider "all relevant circumstances," including the following factors: (1) the danger of prejudice to the debtor; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was in the reasonable control of the movant; and (4) whether the movant acted in good faith. *Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 395 (1993). Upon careful review, we find that the Bankruptcy Court did not abuse its discretion in determining that Appellant had failed to establish that her late filing was the result of excusable neglect.

### i.  Prejudice to the Debtor

Appellant maintains that Debtor will suffer no prejudice if her late-filed claim is treated as timely filed because Debtor did not interpose any objection to Appellant's motion. *See* Dkt. 6 at 26. However, whether Debtor officially interposed an objection to Appellant's motion is not controlling in a determination of prejudice. In assessing this factor, the Bankruptcy Court correctly focused on the prejudice to Debtor, emphasizing the importance of the bar date in the administration of the bankruptcy which should carry weight when considering a belated claim on behalf of any individual who knew that she

was abused, yet failed to file a timely claim. The bar date was crucial in the Bankruptcy Court's assessment of prejudice, the judge noting that "[o]therwise, if I said anybody who didn't file a claim can tell me that they didn't get actual notice of the filing and the bar date, that could potentially be a pretty wide net. So I think there is danger of prejudice to the debtor." Dkt. 26 at 32.

Appellant asserts that, if her claim is not included in the present group of claimants, she will suffer harm that outweighs any prejudice to Debtor and other parties in interest. She challenges the Court's finding as to this first factor on the grounds that it was merely speculative, and that no actual prejudice was ever asserted by Debtor. This approach does not comport with an appropriate *Pioneer* analysis. Appellant maintains that there was "not a single fact" to support the Bankruptcy Court's conclusion that Debtor would suffer prejudice, [Dkt. 9 at 19], and that because her claim would "constitute the merest fraction of the $215 million that the current plan of reorganization anticipates being available for survivors," no significant financial burden on Debtor nor hindrance of the reorganization plan would result. *Id.* at 19–20.

The Bankruptcy court, however, had to confront the impact of this claim on the entirety of the litigation. The judge feared that if Appellant's claim were treated as timely, the then-ongoing and protracted and multilateral mediation and negotiation process, which had already entailed enormous amounts of time and energy over approximately

two years time, would be disrupted.[1] The mediation process—along with any potential

resulting settlements—had been predicated on the existing claims that were timely filed

against Debtor. Appellee believed that the negotiation process already underway could

not reasonably absorb late filed claims. The risk of inviting even more belated claims if

Appellant's claim were permitted would seriously impede the continued, efficient

processing of the bankruptcy proceeding.

As recognized by one of our sister district courts within the Seventh Circuit,

"Prejudice from a late-filed claim is greater when the creditor's delay extends into the

period in which the plan of reorganization is being 'negotiated, drafted, filed or

confirmed.'" *In re Kmart Corp.*, 315 B.R. 718 (N.D. Ill. 2004). Here, the Bankruptcy

Court considered the arguments on both sides and concluded that a risk of prejudice to

Debtor would result from allowing the belated claim to proceed and that the potential risk

of inviting additional claims was significant. The evidence before the Bankruptcy Court

supported such a reasoned decision, and we will not reweigh that evidence or disrupt the

Bankruptcy Court's factual findings. We conclude that they are not clearly erroneous

based on the ample record before us.

### ii.  Length of Delay, and Its Potential Impact on Judicial Proceedings

Appellant also contends that the length of delay factor in the filing of her claim

reveals little to no impact on the ongoing bankruptcy court proceedings. Regarding the

---

[1]In the Bankruptcy Court hearing, Appellee relied upon the same prejudice arguments they raised earlier in response to a motion to treat a different Appellant's belated claim as timely. Counsel for Appellant Jane Doe JJ was present at the hearing when Appellee raised these arguments.

delay, the Bankruptcy Court observed that "the length of the delay is somewhat notable. As I said, she was well aware that she had a claim, she just didn't act to bring the claim presumably because she, as she said, she only got constructive and not actual notice. I'm not going to open the door to any more." Dkt. 6 at 32. The Court's obvious concern was that in allowing a claim based on a lack of direct notice, a significant impact would result on the ongoing bankruptcy proceedings in opening the floodgates to additional belated claims. Any such inundation would clearly negatively impact the course of the pending proceedings, including the potential for a final settlement.

Appellant states that she first realized she had a claim in August 2019 and that she filed her proof of claim two months later. She challenges the Bankruptcy Court's failure to make any specific finding that the bankruptcy proceedings as a whole would be impacted by her delay in filing her claim. Noting that the Bankruptcy Court had previously allowed another late-filed claim brought by Erin Kaufman on June 21, 2019, Appellant compares her claim to pose no greater risk of disruption than Ms. Kaufman's did. However, the record reflects that Ms. Kaufman's claim was filed less than two months after the bar date, whereas Appellant's claim was filed approximately five months after the bar date and after extensive mediation had been conducted between and among the existing parties to the case.

The Bankruptcy Court clearly considered both the length of the delay and its potential impact on the ongoing judicial proceedings. Regarding the impact of delay, "[n]o formula exists to calculate precisely when a delay is simply too long to be considered 'excusable' within the excusable neglect analysis. It is an equitable

determination made on a case-by-case basis based on the evidence presented." *In re National Steel Corp.*, 316 B.R. 510 (Bankr. N.D. Ill. 2004). In *In re National Steel Corp.*, the Bankruptcy Court for the Northern District of Illinois denied a motion to allow an untimely claim that was filed sixteen months after the claims date. *Id.* at 519. By contrast, in *In re KMart Corp.*, 381 F.3d 709 (7th Cir. 2004), the Seventh Circuit affirmed a bankruptcy court's refusal to allow an untimely claim on a theory of excusable neglect when the length of delay in filing was just one day after the original bar date.

We find no basis on which to conclude that the Bankruptcy Court's assessment of the five-month delay was unduly or unfairly long compared to other cases to be clearly erroneous. "In overseeing [the Chapter 11] process, the bankruptcy courts are necessarily entrusted with broad equitable powers to balance the interests of the affected parties, guided by the overriding goal of ensuring the success of the reorganization*." Pioneer*, 507 U.S. at 389. In its determination, the Bankruptcy Court properly assessed the impact of the length of this delay on the ongoing bankruptcy proceedings and reasonably concluded that the upshot of this analysis favored Debtor. This decision was not clearly erroneous—especially in light of the broad equitable powers granted to bankruptcy courts in overseeing Chapter 11 reorganizations.

### iii.  Reason for Delay

Appellant next argues that the legitimacy of her reasons underlying and explaining her delay in filing her claim is compelling enough to warrant a finding of excusable neglect. She contends that she did not know that she had a viable claim until she retained legal representation in August 2019 because she had never received notice of the

16

bankruptcy proceeding. Dkt. 9 at 7. The Bankruptcy Court found this explanation of her delay unpersuasive, noting that Appellant was well aware that she had a claim, but failed to bring it apparently simply because she had not been provided with actual notice. Dkt. 6 at 32. Appellant maintains that this delay was beyond her control also because the trauma that followed the abuse she suffered at the hands of Dr. Nassar led to a delayed understanding of what happened to her. Appellee characterizes Appellant's grounds for justifying the delay as a collateral attack on the bar order, emphasizing that the extensive publication notice provided by Debtor was sufficient to meet the standards set out in *Fogel*.

The record makes clear the Bankruptcy Court's fair consideration of Appellant's reason for delay and the judge's reasons for not crediting it as a justification for her late filing. The Bankruptcy Court relied on the "extraordinary" notice and extensive efforts to identify potential claimants in an effort to include all of the numerous parties in a fair settlement. As discussed above, Appellant's due process rights were not violated by the lack of actual notice to her because publication notice was an appropriate alternative given the extraordinary number of undeterminable, unknown claimants. The Bankruptcy Court's conclusion that Appellant's reason for her delay did not suffice as a justification for allowing her late claim was not clearly erroneous, especially in light of the Court's satisfaction of the first two *Pioneer* factors.

### iv. Appellant's Good Faith

Finally, Appellant argues that her good faith in asserting a belated claim supports a finding of excusable neglect, contending that she had filed her claim as soon as she fully

came to understand the impact of the sexual abuse she had suffered and shortly after having retained counsel. She cites as error the Bankruptcy Court's failure to consider evidence demonstrating the promptness of her filing under the circumstances. Indeed, the Bankruptcy Court did not enter any explicit finding of bad faith on the part of Appellant and despite the reminder that Appellant had a responsibility to be aware, there was no finding of dishonesty on her part.

Clearly, the Bankruptcy Court did not ignore Appellant's claims of good faith. Appellant's disagreement with the Bankruptcy Court centers on her disagreement with the Bankruptcy Court's conclusion that Appellant's good faith did not overcome the totality of all the other factors undermining a finding of excusable neglect. The Bankruptcy Court weighed the factors, ultimately settling on the primary importance of closing the door to any further belated claims. We find no basis on which to fault, let alone set aside, this analysis by the Bankruptcy Court as clearly erroneous or an abuse of discretion. Our review does not permit or entail a reweighing of the *Pioneer* factors; we examine on appeal the legal sufficiency and acceptability of the bankruptcy judge's exercise of discretion in reaching her conclusions, which we have done here, finding it to be legally and factually sound.

### III.   Conclusion

Dr. Larry Nassar's pattern of sexual abuse was horrific in every way—almost beyond telling. In its scope and impact, it was both unprecedented and unconscionable. Like the Bankruptcy Court, we acknowledge the difficulties that inhere to any judicial efforts to find fairness and to carve out adequate remedies in such a context as these cases

present. We neither doubt nor diminish in any respect Ms. Doe's emotional trauma from her victimization. However, after thorough review of the record before us, we find no clear error by the Bankruptcy Court in its determinations of fact or legal analysis, nor do we find any abuse of discretion in denying a finding of excusable neglect. We emphasize that our ruling here is not intended to carry any import regarding Appellant's potential eligibility to file as a future claimant, if such an opportunity were to present itself following the conclusion of the present bankruptcy litigation.

For the above explicated reasons, the Bankruptcy Court's denial of Appellant Jane Doe JJ's Motion to Allow Late Filed Claim to be Treated as Timely Filed is <u>AFFIRMED</u>.

IT IS SO ORDERED.

Date: _____9/21/2021_____          _Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

John J. Allman
HESTER BAKER KREBS LLC
jallman@hbkfirm.com

Kenneth H. Brown
Pachulski Stang Ziehl & Jones LLP
150 California St
15th Floor
San Francisco, CA 94111

Andrew S. Buzin
BUZIN LAW, P.C.
abuzin@buzinlaw.com

Deborah J. Caruso
RUBIN & LEVIN, P.C.
dcaruso@rubin-levin.net

Steven W. Golden
IPachulski Stang Ziehl & Jones LLP
780 Third Ave
Ste 34th Floor
New York, NY 10017

Gregory M. Gotwald
PLEWS SHADLEY RACHER & BRAUN LLP
ggotwald@psrb.com

John Thomas Piggins
MILLER JOHNSON
45 Ottawa Ave
SW Ste 1100
PO box 306
Grand Rapids, MI 49501

George M. Plews
PLEWS SHADLEY RACHER & BRAUN LLP
gplews@psrb.com

Melissa Megan Root
JENNER & BLOCK LLP
mroot@jenner.com

Ilan D. Scharf

PACHULSKI STANG ZIEHL & JONES LLP
ischarf@pszjlaw.com

James I. Stang
Pachulski Stang Ziehl & Jones LLP
150 California St
15th Floor
San Francisco, CA 94111

Catherine L. Steege
JENNER & BLOCK LLP
csteege@jenner.com

Mark D. Stuaan
BARNES & THORNBURG, LLP (Indianapolis)
mstuaan@btlaw.com

Meredith R. Theisen
RUBIN & LEVIN, P.C.
mtheisen@rubin-levin.net